# Richmond.

FORD v. ENGLEMAN AND OTHERS.

November 11, 1915.

1. DURESS—*Proof Required—Case in Judgment.*—Duress is a species of fraud and hence must be clearly proved, but, without deciding what amounts to duress because unnecessary in the case in judgment, the evidence is not sufficient to establish duress under either statement of the rule laid down by the courts.

2. CONTRACTS—*Consideration—Promise of Marriage.*—In the case in judgment, the defendant had a complete cause of action against the complainant for a breach of promise of marriage which she released, and this was a sufficient consideration for the contract from which the complainant now seeks to be released on the ground that it was without consideration.

Appeal from a decree of the Circuit Court of Rockbridge county. Judgment for the complainants. Defendant appeals.

*Reversed.*

The opinion states the case.

*Hugh A. White,* for the appellant.

*Timberlake & Nelson,* for the appellees.

KEITH, P., delivered the opinion of the court.

The bill in this case states that on or about February 5, 1912, Charles P. Engleman met on the streets of the town of Lexington a young woman by the name of Lillian Ford, who lived in the neighborhood of his home in Rockbridge county, and with whom he was well acquainted; that he was about to take the

train from Lexington to Roanoke, and in the course of conver-
sation with him she informed him that she was on her way to
Clifton Forge, and suggested that they go that far together;
that they went to Clifton Forge and it was agreed between them
that they would spend the night there together; that this agree-
ment was carried out and the plaintiff registered himself and
Lillian Ford at a hotel as man and wife, and that they occupied
the same room on the night of February 5, 1912. He states in
his bill that there was no sexual intercourse on that occasion
between Lillian Ford and himself; that the next morning he
left Clifton Forge and went to Roanoke and she stayed at Clif-
ton Forge, saying that she expected to remain there a week or
so; that what happened became known to the families of both
Charles Engleman and Lillian Ford, and one of her brothers
took it upon himself to force Charles P. Engleman to make
some money settlement of the matter, threatening that he would
have him (Charles P. Engleman) prosecuted and sent to the
penitentiary unless some such settlement was made; that Ford,
the brother, became so insistent that Charles P. Engleman and
his brother and coplaintiff finally consented to go with him to
Dayton, Ohio, where Lillian Ford then was, for the purpose of
discussing the matter with her and seeing what adjustment of it
could be made; that when the Engleman brothers, the plaintiff,
and Ford reached Dayton they talked the matter over with
Lillian Ford, and she stated to them that there had never been
any sexual intercourse between Charles P. Engleman and her-
self, and that she had no claim whatever upon him, but in spite
of this statement Ford insisted that he could and would have
Charles P. Engleman prosecuted and sent to the penitentiary
unless he made some money settlement of the matter; that
knowing nothing of the law, under the influence of this threat,
plaintiffs finally agreed that Charles P. Engleman should exe-
cute his four promissory negotiable notes to Lillian Ford, bear-
ing date March 13, 1912, three of them for $200, payable,
respectively, at six months, eighteen months and two and a half

.years after date, and one for $100 payable three and one-half years after date; that the plaintiffs, J. W. Ford and Lillian Ford, thereupon went to the office of a lawyer in Dayton and had an agreement between Charles P. Engleman and Lillian Ford drawn, and they signed and acknowledged it. This agreement is made an exhibit with the bill. Contemporaneously with the execution of this agreement, Charles P. Engleman executed and delivered to Lillian Ford the four negotiable notes as provided in the agreement, and O. T. Engleman endorsed the notes as surety.

The claim is that these notes are invalid because executed under duress and without legal consideration. The plaintiffs further represent that the notes are all negotiable and that Lillian Ford is wholly without property or means of any sort, so that if she should transfer the notes to an innocent holder for value, plaintiffs would be without redress; therefore, they come into a court of equity and pray that she may be required to answer the bill, but not under oath; that said notes may be declared to be null and void and of no binding force or effect; that she may be required to surrender said notes; that a proper decree providing for their cancellation be entered, and that she may be enjoined and restrained from suing upon, negotiating or transferring said notes or any of them until the further order of the court.

Lillian Ford answered this bill, admitted that she was on her way to Clifton Forge when she was joined by the plaintiff, Charles P. Engleman, and he suggested that he would go with her to that place; that she was at the time engaged to be married to him and was glad of his company; that she expected to spend some time in Clifton Forge with friends there, with some expectation of going to Dayton, Ohio, for a more or less extended visit. She alleges that before reaching the city of Clifton Forge Engleman suggested that instead of going to the home of her friends in Clifton Forge at once, they spend the night at the hotel, as they would have a better opportunity to talk over

their affairs than at the home of her friends, and to this she consented; that on reaching Clifton Forge he left her in the depot and went to the office of the hotel to register, and in a short time returned and a bell boy took their baggage and they followed, and Engleman then told her that he had registered them as man and wife. She further avers that she was shocked and surprised at this and stated that it would not be right for them to occupy the same room as they were not married; that Engleman replied that it would be all right as they would be married in five or six weeks, and that nobody would know anything about it; that she still objected, but he insisted, and she finally yielded to his views because of the fact that they were engaged to be married and Engleman had promised that they should be married in the course of five or six weeks. She states that they occupied the same room and the same bed as man and wife, and that she did submit to sexual intercourse with him, and that she never would have done so but for the fact that he had her entire confidence and she thoroughly believed in his vows and intentions to marry her. She avers that she and Charles P. Engleman had been sweethearts since they were schoolchildren; that they had been engaged for several years, and that the reason they had never been married was that he had no established occupation or means of support. She avers that the matters stated produced the most embarrassing situation for her, and that in consequence she left Clifton Forge and went to Dayton, Ohio, expecting Charles P. Engleman to follow as he had promised to do. She avers that her home people had interviews with Engleman and that he promised them he would do the right thing and would carry out his promise to marry her, and finally he agreed to go to Ohio for that purpose; that he and her brother, J. W. Ford, left Virginia for that purpose, and her brother was surprised when he found that O. T. Engleman was going with them; that after they reached Dayton, Ohio, Charles P. Engleman and his brother suggested that a money settlement of the matter be made; that respondent

objected and never did willingly agree to it until it was represented to her by Charles P. Engleman and O. T. Engleman that this would straighten up the matter and protect her; that she did sign the paper referred to as Exhibit "A" with the bill, and that she did it only because she was told that by doing so it would settle the matter and protect her and Charles P. Engleman, who even at that time stated that he still intended to marry her, but that making the settlement would quiet the matter at home.  She denies that any threats were ever made by her or her brother or any member of her family, and declares that she never did want the money settlement, but did make it and now stands on it and demands its fulfillment.  She further states that since the settlement was made her brother, J. W. Ford, had, at the instance of his mother, sworn out a warrant against Charles P. Engleman for the crime of seduction, and that he had been sent on to the grand jury under a bond of $2,000.

Upon the issues thus made depositions were taken.  O. T. Engleman, in his deposition, states that J. W. Ford came to him and said that something had to be done right away, and that a money consideration would have to be paid or Charlie would have to marry Lillian.  He says that he told him that he supposed his brother Charlie would do what was right, and he then said that he had consulted a lawyer in Clifton Forge who told him that Charles P. Engleman was liable to be sent to the penitentiary for ten years, and that they were going to send him to the penitentiary unless he paid some money consideration or married his sister; that subsequently he said to him and to his brother, Charlie, who were together at the time, that if he did not fix things up he would be subject to ten years in the penitentiary; that Charlie told him he did not want to go to the penitentiary, and that he would go out to Dayton with him and they arranged to go a couple of days later.  The deposition of C. P. Engleman is pretty much to the same effect.  Both Charles P. Engleman and his brother, O. T. Engleman, state

positively and without reserve that they were induced to execute the contract and notes because of J. W. Ford's threats to prosecute Charles P. Engleman and send him to the penitentiary. A disinterested witness, one Fred H. Wilhelm, also testified that J. W. Ford, shortly before the trip to Dayton, Ohio, asked him to see Charles Engleman and tell him that there was one of three things he (J. W. Ford) wanted him (Chas. P. Engleman) to do—marry Lillian, stand trial or leave the country. On the other hand, J. W. Ford and Lillian Ford both emphatically deny that there were any such threats, and it strikes one as a somewhat singular fact, under the circumstances, that when Charles Engleman and J. W. Ford were arranging a trip to Dayton, Ohio, to meet Lillian Ford and come to some adjustment of the trouble, they occupied the same room in a hotel in Buchanan, Va., and the relations between them seemed to be entirely friendly. When O. T. Engleman, Charles Engleman, J. W. Ford and Lillian Ford met in Dayton, Ohio, nothing whatever was said with respect to a prosecution. The Englemans sent for a lawyer to prepare the agreement. The demand was at first made on behalf of J. W. Ford for $2,000, then for $1,000, and finally a compromise was agreed upon and reduced to writing, "In consideration whereof, said Lillian Ford hereby settles and releases said Charles P. Engleman from all claim or claims she now has or may have against him by reason of having occupied said room in said hotel, or having so registered as man and wife at said hotel, or from any other and all claim, claims or demands said Lillian Ford may have against said Charles P. Engleman for any reason whatsoever."

In Clark on Contracts, page 356, section 172, it is said: "Duress is a species of fraud. It means some actual or threatened personal violence against, or imprisonment of, a person, or of his very near relative, by reason of which he is forced or induced to enter into a contract." "It is of two kinds: (a) Duress of imprisonment—that is, where the person is actually imprisoned; and (b) duress *per minas*—that is, where he is

threatened with imprisonment or personal violence. The ground upon which a contract entered into under duress can be avoided is because there is no real consent. The apparent consent is unreal because of the imprisonment or force, or of the fear caused by the threats."

In Elliott on Contracts, section 140, it is said: "There are three well defined periods of development in the law relative to duress. By ancient authorities it was held that duress could only exist where there was such a threat of danger to the object of it as was deemed sufficient to deprive a constant, or courageous man of his free will. The resisting power which every person was bound to exercise for his own protection was measured, not by the standard of the individual affected, but by the standard of the man of courage. At a subsequent period it was stated by text writers and courts of last resort that duress, sufficient to render the contract voidable must be of a nature to overcome the will of a person of ordinary firmness or courage. This statement of the rule is still found in many recent authorities. Within recent years, however, the rule has been further modified and rendered more flexible. Courts now hold and text-books affirm that the test is not whether the threat was sufficient to overcome the will of a man of courage, or of ordinary courage, but whether it actually overcame the will of the person threatened."

We know of no Virginia case which throws light upon this subject.

In *McClair* v. *Wilson,* 18 Colo. 84, 31 Pac. 503, the general rule as stated in 1 Parsons on Contracts, 393-5, 1 Chitty on Contracts, 269-73, and *Silliman* v. *United States,* 101 U. S. 465, 25 L. Ed. 987, is said to be that "Duress by threats does not exist wherever a party has entered into a contract under the influence of a threat, but only where such a threat excites a fear of some grievous wrong; as of death, or great bodily injury, or unlawful imprisonment. . . . But where the threat, whether of mischief to the person or the property, or to the good name,

was of sufficient importance to destroy the threatened party's freedom, the law would not enforce any contract which he might be induced by such means to make." Commenting upon this statement of the law, it is said: "The first part of the foregoing quotation is a fair statement of the more rigid rule—the latter, of the more lenient rule—in respect to duress."

It would seem that the modern rule, which only takes into consideration the effect of the threat on the mind of the person subjected thereto, is too loose and uncertain. The validity of contracts would be greatly impaired if the principle enunciated were generally accepted. The analogies of the law seem to favor resort to a standard of the man of ordinary firmness and courage. For instance: "Reasonable diligence" means such diligence as an ordinary person would exercise under similar circumstances. Words and Phrases, vol. 7, p. 5958. The expression "ordinary persons," in common parlance means men of ordinary care and diligence in relation to any particular thing. And so, "ordinary neglect" means want of that care and diligence which prudent men usually bestow on their own concerns; or such neglect as would not be suffered by men of common prudence and discretion. Words and Phrases, vol. 6, pp. 5046-7.

Such terms, however, do not offer an exact standard by which the subjects to which they are applied can be measured, but do offer some guide for determining the probative value of evidence.

In the case before us there is nothing to show that the Englemans were timid or of inferior intellect. They appear in all respects to have been as ordinary men are. While we incline to the modified rule which holds that the duress which invalidates a contract means that degree of constraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to overcome the mind and will of a person of ordinary firmness, we are not required in this case to decide the point. Duress being a species of fraud must be clearly proved, and in our opinion the

evidence fails to bring it within the operation of either statement of the rule. We cannot agree, therefore, with the learned judge of the circuit court, who was of opinion that duress was satisfactorily established by the evidence.

It is contended, however, that the contract and notes were without consideration. Lillian Ford states in her answer and in her deposition that Charles P. Engleman promised to marry her, and that in consequence of that promise she submitted to intercourse with him. He denies that there was any promise of marriage, and yet he admits that he registered himself and Lillian Ford as man and wife, and that they occupied the same room and the same bed, but says there was no sexual intercourse between them—which those who will may believe. Upon this point the case turns almost wholly upon the testimony of the plaintiff, Charles P. Engleman, and the defendant. His statement is a strain upon credulity, while hers is in accordance with the general experience and conduct of mankind.

In the contract filed with the bill, and from which we have already quoted, Lillian Ford releases Charles P. Engleman from all claim or claims which she may have against him by reason of the occurrences we have narrated. Her case, as stated in her answer, and which we think she establishes by proof, shows that she had a complete cause of action against him for a breach of promise of marriage, the release of which was a sufficient consideration for the contract made.

Upon the whole case, we are of opinion that the decree should be reversed, and this court will proceed to enter such decree as the circuit court should have rendered.

*Reversed.*