**FREEDLANDER, INC. THE MORTGAGE PEOPLE, et al., Plaintiffs,**

v.

**NCNB NATIONAL BANK OF NORTH CAROLINA, Defendant.**

Civ. A. No. 88–0052–R.

United States District Court,
E.D. Virginia,
Richmond Division.

Aug. 10, 1988.

Joseph W. Kaestner, Bell & Kaestner, Richmond, Va., for Eve and Ruben Freedlander.

Eric M. Freedlander, Doswell, Va., pro se.

David H. Adams, Virginia Beach, Va., for trustee in bankruptcy.

Robert H. Patterson, Jr., Robert E. Payne, E. Duncan Getchell, Jr., H. Slayton Dabney, Jr., Catherine N. Currin, Thomas Spahn, McGuire, Woods, Battle & Boothe, Richmond, Va., for defendant.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

This matter is before the Court on the defendant's motions for summary judgment, pursuant to Fed.R.Civ.P. 56(b), and,

**1212**

alternatively, for dismissal, pursuant to Fed.R.Civ.P. 12(b)(6). NCNB North Carolina National Bank ("NCNB") asserts that the General Release executed as part of a Settlement Agreement dated October 2, 1987 ("the Agreement") bars the plaintiffs' actions described in Counts 1–14 and 17 of their complaint. NCNB moves for summary judgment on the remaining counts, 15 and 16, on the grounds that NCNB did not breach the Agreement as alleged and that Freedlander is estopped from claiming a breach. The plaintiffs argue that the Agreement is invalid because it was procured by economic duress, and NCNB has materially breached the terms of the Settlement Agreement, thereby voiding the release.

■ The law of Virginia governs the validity of the release and the defense of economic duress since the release stipulates that Virginia law will apply, *Gordonville Industries, Inc. v. American Artos Corp.* 549 F.Supp. 200 (W.D.Va.1982), and the release was signed in Richmond, Virginia. *Witter v. Torbett,* 604 F.Supp. 298 (W.D.Va.1984). Economic duress is "not readily accepted as an excuse" to bar the enforcement of a contract under Virginia law. *Seward v. American Hardware,* 161 Va. 610, 171 S.E. 650, 662 (1933). The defense fails in this instance as a matter of law given the length of time between the alleged wrongful acts and the signing of the Settlement Agreement. The plaintiffs' second challenge also fails since NCNB did not materially breach the terms of the Agreement so as to void the release. Consequently, the release is valid and NCNB is entitled to summary judgment as a matter of law. Because the summary judgment motion is dispositive, the Court does not address NCNB's motion to dismiss the Amended Complaint under Fed.R.Civ.P. 12(b)(6).

■ As an initial matter the plaintiffs challenge the appropriateness of summary judgment. They assert that their claim of duress in response to the defendant's affirmative defense of release turns upon Eric, Eve, and Ruben Freedlander's states of mind when they entered into the Settlement Agreement. They note that "summary judgment is seldom appropriate in cases wherein particular states of mind are decisive as elements of [a] claim or defense," *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979), because "resolution of [the issue of state of mind] depends so much on the credibility of the witnesses, which can best be determined by the trier of facts after observation of the witnesses during direct and cross examination." *Morrison v. Nissan Co., Ltd.,* 601 F.2d 139, 141 (4th Cir.1979). The mere assertion that one's free will was subverted, however, cannot bolster a claim that is unsupported by the facts and that would otherwise not withstand a motion for summary judgment. "[U]nsupported allegations as to [state of mind] do not confer talismanic immunity from Rule 56." *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985). The Supreme Court noted that even where state of mind is an issue, the normal rules governing summary judgment apply: "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202, 217 (1986). In addition to their own statements, the plaintiffs must produce objective evidence of their duress. The defense of economic duress does not turn only upon the subjective state of mind of the plaintiffs, but it must be reasonable in light of the objective facts presented. *Ford v. Engleman,* 118 Va. 89, 96, 86 S.E. 852, 855 (1915).

Secondly, the plaintiffs argue that summary judgment is inappropriate because they have not had the opportunity to take any discovery. They rely on the Supreme Court's decision in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), which states that a court should decline entry of summary judgment where the "non-moving party has not had the opportunity to discover information that is essential to his opposition." 477 U.S. at 250, n. 5, 106 S.Ct. at 2511, n. 5. Where a party believes that it has been

denied an adequate opportunity to develop facts bearing on a summary judgment motion, it can follow the procedures set forth in Fed.R.Civ.P. 56(f) and state by affidavit "that [it] cannot for reasons stated present by affidavit facts essential to justify its opposition." 477 U.S. at 326, 106 S.Ct. at 2554. The plaintiffs have chosen not to file such an affidavit, and for the purposes of this motion it does not appear necessary.

Here, discovery would not aid in the resolution of this matter. The Freedlanders' version all that is disputed is accepted; all internal conflicts in it resolved in their favor; the most favorable of all possible inferences from it drawn in their behalf; and they are given the benefit of all favorable legal theories invoked by the evidence so considered. *Charbonnages*, 597 F.2d at 414. In this respect the cautionary warnings of *Charbonnages* and *Anderson* regarding the plaintiffs' state of mind are followed. Other cases relied on by the plaintiffs, such as *Citibank, N.A. v. Real Coffee Trading Co.*, 566 F.Supp. 1158 (S.D. N.Y.1983), are inapplicable. In *Citibank*, a party also asserted economic duress as a defense to a release. Unlike the instant case, however, the validity of the release depended upon resolution of genuine issues of material fact. Here, the Court adopts the plaintiffs' versions of the facts without challenge.

In considering the defendant's motion, the Court must also give full force and effect to Rule 56:

Summary Judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of an action.' Fed Rule Civ Proc 1 ... Rule 56 must be construed with due regard not only for the rights of the person asserting claims and defenses that are adequately based in facts to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

The issue before the Court is simply can the plaintiffs assert a defense of economic duress on the facts alleged. As a matter of law, they cannot.

Freedlander, Inc., The Mortgage People ("Freedlander") was a Virginia, family-owned corporation whose principle business was the making of fixed-rate consumer loans secured by a mortgage on residential real estate.[1] A number of Freedlander subsidiaries [2], Freedlander Incorporated, a real estate management firm, and Freedlander's owners are also plaintiffs in this action. Eric Freedlander, President of Freedlander, and his parents, Eve and Ruben Freedlander, collectively own 97% of the company's stock. Freedlander's business was dependent on its ability to obtain financing with which to make consumer loans, and its ability to resell these loans to financial institutions in the secondary market. Once the loans were sold, Freedlander collected a fee for servicing the loans—collecting payments, maintaining records, and other administrative tasks.

Initially one source of financing for Freedlander's consumer loans, NCNB became Freedlander's principle source of credit in February 1984 when the parties entered into a Warehousing Agreement. Under the Warehousing Agreement, NCNB created a line of credit for Freedlander's use in the financing of consumer loans. The line of credit was to be paid down with funds from the subsequent sales of the loans in the secondary market. (Eric Freedlander, Aff. ¶¶ 7–9)

As the business grew, Freedlander needed a larger line of credit to generate more consumer loans. Eric Freedlander con-

---

1. Freedlander is currently being liquidated in a Chapter 7 bankruptcy action.

2. Freedlander Financial Services of Kentucky, Freedlander Inc., The Mortgage People of California, Freedlander, Inc., The Mortgage People of Tennessee, Freedlander Financial Services of New Mexico, and Freedlander Racing Team, Inc.

sidered approaching other banks, but NCNB demanded that Freedlander rely exclusively on NCNB. (Eric Freedlander, Aff. ¶ 11). NCNB also demanded that Freedlander allow NCNB's investment banking group to market the loans in the secondary market, and in return NCNB would extend additional credit. NCNB was only successful in marketing the loans to the Federal Home Loan Mortgage Corporation ("FHLMC"). Upon further investigation, FHLMC discovered that only a portion of Freedlander's loans met its requirements. Instead of allowing FHLMC to buy only the least risky loans, Freedlander demanded return of the entire loan portfolio. (Eric Freedlander, Aff. ¶¶ 12-17)

As a consequence of NCNB's unsuccessful attempt to market Freedlander's loans, Freedlander did not pay down its line of credit with NCNB. By June 1986, Freedlander's outstanding borrowings from the bank approached $200 million, an amount NCNB claimed was in excess of its legal lending limit. (Eric Freedlander, Aff. ¶¶ 18-19). Purportedly in violation of its duty of good faith and fair dealing, NCNB threatened to deny Freedlander additional credit unless it agreed to sell NCNB $180 million of its consumer loans. Although the sale reduced Freedlander's income on each of the loans from a spread of 6 to 8% to 2 to 2½, of more serious consequence was NCNB's treatment of the transaction as a continuation of Freedlander's existing indebtedness rather than a purchase. (Ben Freedlander, Decl. ¶¶ 8-9). Freedlander incurred additional expenses of nearly $9 million as a result. As a consequence of this treatment, new limitations on the extension of credit to Freedlander, and NCNB's subsequent breaches of the Purchase Agreement, NCNB transformed Freedlander from "a thriving, growing, profitable business to a moribund operation, struggling to survive day to day." (Amended Complaint ¶ 50)

Freedlander also claims that NCNB forced it, in its weakened state, to enter into a Loan Agreement dated April 30, 1987. Although the plaintiffs allege that terms of this Agreement were particularly onerous and that they entered into it under economic duress and coercion, the agreement is unimportant for the purposes of this motion. NCNB asserts that the release contained in the October 2, 1987 Settlement Agreement bars this action. Hence the circumstances surrounding the signing of the Loan Agreement serve only as another illustration of NCNB's coercion which the plaintiffs claim broke their will.

Freedlander also alleges that NCNB interfered with its efforts to sell its consumer loans to purchasers in the secondary market. In April and May 1987, Lenders Corporation purchased a significant amount of Freedlander's loans. NCNB also approached Lenders to sell it loans it had purchased under the earlier Purchase Agreement. Freedlander claims that NCNB poisoned Lender's faith in Freedlander during the course of these dealings, and consequently Lenders ceased its purchases in June.

By July 1987, Freedlander's servicing business was its only source of profitability. NCNB proposed to buy this portion of the business in return for a series of payments and the bank's release of liens it held. Eric Freedlander refused to agree to the sale. Several hours after Eric's refusal on July 10, Buddy Kemp, NCNB's President, appeared in Eric's office, called the Charlotte, North Carolina "wire room" (the branch of the bank that controls the clearing of checks on a daily basis), and told Eric that if he did not agree to sell the servicing operations in 15 minutes he would tell the wire room to allow checks written on one of Freedlander's accounts to bounce. Although, this account was overdrawn, in the past NCNB had always covered the checks with new credit. After initially resisting NCNB's pressure, Eric Freedlander agreed to the sale because he felt if checks were allowed to bounce Freedlander would be in "immediate jeopardy." (Eric Freedlander, Aff. ¶ 52) He signed the Servicing Agreement on behalf of the corporation.

NCNB was not forthcoming with monies owed under the purchase of the Servicing Operations, and with few sources of other income, Freedlander could not meet its July

31 payroll. NCNB agreed to pay Freedlander $330,000 owed under the July 10 agreement if Freedlander would sell an airplane which NCNB had a lien on, acknowledge that Freedlander had not complied with the terms of the July 10 Servicing Agreement, and agreed to release NCNB from any liability owed Freedlander. Freedlander consented.

In August NCNB stopped doing business with Freedlander entirely because the corporation's mortgage disbursement account was overdrawn. Freedlander sought performance of the July 10 Agreement and a settlement of its disputes with NCNB. NCNB proposed that (1) Freedlander acknowledge that NCNB had no remaining obligations to Freedlander; (2) provide indemnities of NCNB and its personnel in the event of litigation; and (3) execute another release.

Five drafts of the Settlement Agreement exchanged hands over a five week period. Freedlander and Eric, Eve, and Ruben Freedlander eventually signed the Agreement. The release contained in the Agreement states in pertinent parts:

> The undersigned Companies and individuals ("the Undersigned") on their own behalf and on behalf of their predecessors, successors and assigns, for good and valuable consideration including, without limitation, NCNB National Bank of North Carolina ("NCNB") simultaneously executing the Settlement Agreement and Loan Modification Agreement ... hereby remise, release, and forever discharge NCNB and each of NCNB's present, future and former officers, directors, employees ... from any and all claims, losses, liabilities, demands and causes of action of any kind whatsoever, if any, whether absolute or contingent, know or unknown, matured or unmatured that any of the Undersigned may now have or ever had, in whatever capacity, against NCNB ...

On October 9, 1987 the plaintiffs also executed, under seal, written acknowledgments that NCNB had satisfied all of its obligations under the Settlement Agreement.

■ NCNB bears the burden of proving that there was a release between the bank and Freedlander. The Settlement Agreement which contains the release is a contract in which the intent of the parties is to be derived from the face of the instrument viewed as a whole. *Virginia Impression Products v. SCM Corporation,* 448 F.2d 262, 265 (4th Cir.1971), *cert. denied,* 405 U.S. 936, 92 S.Ct. 945, 30 L.Ed.2d 811 (1972), *citing Worrie v. Boze,* 191 Va. 916, 62 S.E.2d 876, 880 (1951). Viewing the Settlement Agreement as a whole, the intent of the parties to agree to mutual general releases is apparent. NCNB's claims and Freedlander's claims are set out at page 2 of the Settlement Agreement, and the parties agreed to settle their differences according to the Agreement's provisions. The words reflect the offer and acceptance of traditional contracts and an intention to be bound. Furthermore, the Agreement and the release contained within it are supported by consideration. NCNB foreswore taking legal action it felt it was justified in pursuing and released its rights to guarantees and collateral. The plaintiffs similarly abandoned legal claims they felt they were entitled to pursue. Additionally, the Agreement was signed under seal, a substitute for consideration in Virginia. *Norris v. Barbour,* 188 Va. 723, 736, 51 S.E.2d 334, 339 (1949); *Northwestern National Insurance Co. v. Cohen,* 138 Va. 177, 121 S.E. 507 (1924). NCNB has sustained its burden of proving the initial validity of the release. *See also, Pennsylvania Life Insurance Co. v. Bumbry,* 665 F.Supp. 1190, 1194 (E.D.Va.1987) ("In general, to show the validity of a release, a party must show that there was some dispute between the parties, that the release was signed and executed settling the dispute, and that consideration was given in return for the release.")

The burden of proof is upon the plaintiffs to demonstrate that the release is invalid. To avoid the enforcement of the release under a theory of duress, the plaintiffs must prove by clear, cogent, and convincing evidence, *Nationwide Mutual Insurance v. Muncy,* 217 Va. 916, 919, 234 S.E.

2d 70, 72 (1977); *Cary v. Harris*, 120 Va. 252, 255, 91 S.E. 166, 167 (1917), that NCNB committed an unlawful or wrongful act sufficient to preclude the plaintiffs from exercising their free will and thereby rendering the plaintiffs consent to the agreement involuntary. *Bond v. Crawford*, 193 Va. 437, 69 S.E.2d 470 (1952); *Cary v. Harris*, 120 Va. 252, 91 S.E. 166 (1917). *See also Azalea Drive–In Theater, Inc. v. Sargoy*, 394 F.Supp. 568, 574 (E.D. Va.1975), *reversed on other grounds*, 540 F.2d 713 (1976), *cert. denied*, 430 U.S. 941, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977). The premise of a duress defense is that the contract, here the release, should be voided because "there is no real consent. The apparent consent is unreal because of the imprisonment or force, or of the fear caused by the threats." *Ford v. Engleman*, 118 Va. 89, 95, 86 S.E. 852, 855 (1915).

In assessing whether a party's wrongful act was of such force to overcome the will of the other party, the Virginia Supreme Court has looked to three different standards: "the ancient doctrine that the threat of danger must be sufficient to deprive a *constant* and *courageous* man of his free will, or the modified doctrine, that the threat must be of a nature to overcome the will of a man of ordinary *firmness* or *courage,* or the more recent doctrine, that the threat must be such that it actually overcame the will of the person threatened." *Ellis v. Peoples National Bank*, 166 Va. 389, 393, 186 S.E. 9, 11 (1936) (emphasis in the original). Although the Virginia Supreme has not adopted one of these views, it long ago expressed its leaning toward the "modified" standard: "While we incline to the modified rule which holds that the duress which invalidates a contract means the degree of constraint of danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to overcome the mind and will of person of ordinary firmness, we are not required in this case to decide the point." *Ford v. Engleman*, 118 Va. 89, 96, 86 S.E. 852, 856 (1915). Although the Virginia Supreme Court would likely adopt a purely objective standard, given that the standard

remains an open question under Virginia law and the admonishment that on a motion for summary judgment the non-moving parties are to be given the benefit of all favorable legal theories invoked by the evidence so considered, *Charbonnages*, 597 F.2d at 414, the Court adopts the more "modern" subjective standard—the wrongful act must be of such a nature to actually overcome the will of the persons asserting the duress defense. Eric, Eve and Ruben Freedlanders' statements in their affidavits that their free will was overcome on October 2, however, are insufficient standing alone to defeat a motion for summary judgment. For if this were the rule, the mere assertion of a duress defense would send the case to the jury in each instance. Although the standard is somewhat subjective, it remains rooted in its objective origins. Therefore, even if NCNB's acts were wrongful and the Court accepts as true the individual Freedlanders' statements that they did not exercise their free will in signing the agreement, the Court must still assess whether the Freedlanders' claims are sufficiently supported by objective evidence that a jury should pass upon their merits.

Even if the Court adopts a liberal standard for determining duress, Virginia law still limits the availability of a duress defense in an economic setting. "A contract reluctantly entered into by one badly in need of money without force or intimidation and with full knowledge of the facts is not a contract executed under duress." *Seward v. American Hardware Co.*, 161 Va. 610, 639, 171 S.E. 650, 662 (1933), *citing Cary v. Harris*, 120 Va. 252, 91 S.E. 166 (1917). Moreover, the Virginia Supreme Court has stated that "[c]ompromise agreements are favored ... '[N]o case can be found, we apprehend, where a party who, without force or intimidation and with full knowledge of all the facts of the case, accepts on account of an unlitigated and controverted demand a sum less than what he claims and believes to be due him, and agrees to accept that sum in full satisfaction, has been permitted to avoid his act on the ground that this is duress.'" *Cary v.*

*Harris,* 120 Va. at 257, 91 S.E. at 167, *quoting U.S. v. Child,* 79 U.S. (12 Wall.) 232, 20 L.Ed. 360 (1870). Where a party has entered a contract under duress, it is "incumbent upon [that party] to have proceeded promptly upon the removal of the duress, if such existed, to repudiate the contract." *Gloth v. Gloth,* 154 Va. 511, 552, 153 S.E. 879, 892 (1930).[3] Given these limitations on the applicability of the defense of economic duress, the Court must determine if the issue of duress should be submitted to the jury assuming the plaintiffs prove at trial the facts as alleged. *Anderson v. Liberty Lobby,* 477 U.S. 242, 251–53, 106 S.Ct. 2505, 2511–13, 91 L.Ed.2d 202, 213–14 ("The [Supreme] Court has said that summary judgment should be granted where the evidence is such that it 'would require a directed verdict for the moving party.' [citations omitted] ... [T]he inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.")

Whether or not NCNB committed wrongful acts prior to October 2, 1988 is a matter of factual dispute. Consequently, for the purposes of this motion, the Court assumes that NCNB did commit the wrongful acts as alleged in the Amended Complaint. The plaintiffs contend that NCNB's behavior was a continuous pattern of wrongful acts such that as of October 2, 1987 Freedlander's economic health had deteriorated to the point that it could not resists NCNB's overpowering will. The final wrongful act that allegedly forced the plaintiffs to sign the Settlement Agreement against their will was NCNB's purported breach of the July 10 Agreement. The issue before the Court, then, is did NCNB's past pattern of wrongful acts and its breach of the July 10 Agreement subvert the free will of the plaintiffs such that they did not voluntarily enter into the Settlement Agreement on October 2, 1987.

To support a defense of duress, the plaintiffs must present evidence that NCNB's purportedly wrongful acts caused the plaintiffs to enter into the Settlement Agreement involuntarily. Time plays a critical role in this causation assessment because duress is usually marked by immediacy. The non-consenting party must make an immediate decision to agree to the terms of the contract or face the threatened harm. For example in *Harris v. Cary,* 112 Va. 362, 71 S.E. 551 (1911), Harris sought to have a purchase contract rescinded since he had agreed to it under Cary's threat to sell their corporation's assets and financially ruin him if he refused. The wrongful act and agreement shared a close causal connection. Harris either had to immediately consent or face certain ruin. Similarly, in cases relied on by the plaintiffs, the parties claiming duress were forced to choose to enter a contract within a short, limited, well-defined time span. For instance in *Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Service Co.,* 584 P.2d 15 (Alaska 1978), in which the Alaska Supreme Court liberally applied the rule of economic duress, the defendant's wrongful act and the plaintiff's signing of a settlement agreement occurred within a six week timespan. After the plaintiff incurred large expenses as part of a shipping contract and halfway through the transportation of the goods, the defendant terminated the contract and refused to pay the plaintiff any of its costs. Strapped for cash and its creditors demanding payment within 10 to 30 days, the plaintiff signed a release in return for a cash settlement. *See also Litten v. Jonathan Logan, Inc.,* 220 Pa.Super. 274, 286 A.2d 913 (1971) (The defendant promised to pay off the plaintiff's creditors

---

3. The plaintiffs dismiss the applicability of cases such as *Cary v. Harris,* 120 Va. 252, 91 S.E. 166 (1917) and *Seward v. American Hardware Co.,* 161 Va. 610, 171 S.E. 650 (1933) because "they were decided before the modern trend to expand the circumstances of economic coercion." Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, p. 48. As explained more fully *infra* at 1221, no case suggests that Virginia has adopted the "modern trend" or rejected the holdings of *Cary* and *Seward.* To the contrary, Virginia's Court of Appeals recently reaffirmed the holdings of *Cary* and *Seward* in the sensitive area of child adoption agreements. *Norfolk Division of Social Services v. Unknown Father,* 2 Va.App. 420, 345 S.E.2d 533 (Va.App.1986).

in return for the opportunity to purchase the plaintiff's business. Four days after the creditors were to be paid, the defendant demanded that the plaintiff sign a release by the end of the day or he would refuse to pay the plaintiff's creditors.)

■ In the instant case, there was no similar sense of urgency. Freedlander's monthly cash flow had dropped dramatically after June 1986, and NCNB's wrongful acts had taken their toll on Freedlander nearly a year earlier. Describing Freedlander's financial condition in October 1986, the Amended Complaint states: "The cumulative effect of these crippling financial conditions imposed by the Bank was to transform a thriving, growing, profitable business to a moribund operation, struggling to survive day to day." (Amended Complaint, ¶ 50). Although Freedlander's inability to meet its July 1987 payroll suggests a renewed sense of urgency, this emergency passed after Freedlander secured an influx of cash from NCNB in early August. At the time of the Agreement, Freedlander operated under the same circumstances as it had for the prior four to eight months, and its financial condition was only slightly worse than it had been for the year prior.[4] The facts do not support the assertion that the cumulative effect of NCNB's wrongful acts reached a crescendo in October which drove Freedlander to accept a settlement it did not want to agree to.

The circumstances of the October 2 agreement contrast dramatically with those surrounding the July 10 Agreement. In July Eric Freedlander was given 15 minutes to accept an offer for the purchase of a portion of the servicing operations on terms he disliked or risk placing Freedlander in "immediate jeopardy." It was the threat of immediate harm that compelled Eric Freedlander to sign the Purchase Agreement. No similar urgency forced the plaintiffs to sign a settlement agreement on October 2. The plaintiffs had five weeks from the time the first draft of the Settlement Agreement was presented to them until the time they were asked to sign it—an abundant amount of time to consider and reconsider the propriety of entering into a settlement agreement.

The lapse of time between when the plaintiffs claimed to have been injured by NCNB's purportedly wrongful acts and the date the Settlement Agreement was signed undermines the plaintiffs' claim that they were forced into the agreement. NCNB did not create a sense of urgency nor did it demand that the plaintiffs sign the Settlement Agreement on October 2. The length of time also suggests that the plaintiffs had alternatives to signing the Agreement. These alternatives are further proof that NCNB did not cause the plaintiffs to sign the release and that the plaintiffs acts were volitional. The plaintiffs also enjoyed the benefit of counsel throughout the settlement process, counsel that could advise them both to the terms of the agreement and to alternatives to settlement. Finally, the plaintiffs accepted the benefit of the terms of the settlement once the duress had passed. In light of these circumstances, no reasonable jury could conclude that the plaintiffs' free wills were overcome by NCNB.

Prior to October, the plaintiffs had considered the possibility of filing for bankruptcy (Eric Freedlander, Affidavit at ¶ 43), of suing NCNB for its alleged wrongful behavior (Eric Freedlander, Aff. ¶¶ 47, 79), selling their business to Lenders Corp., or settling their differences with NCNB as

---

**4.** The plaintiffs suggest that Freedlander's monthly cash flow is a good indicator of the corporation's financial health. They note that monthly cash flow dropped precipitously following the sale of $180 million in notes to NCNB, and that it dropped again following the sale to NCNB of part of its servicing business. (Ben Freedlander, Dec. ¶¶ 3–6, Exh. A) Since Freedlander's monthly cash flow was comprised largely of installment payments it received on its second mortgage notes and the servicing fees it collected, a reduction in cash flow is a natural consequence of the sales of $180 million in notes and a portion of its servicing operation. In return for these notes and the servicing operation Freedlander received substantial financial benefits. Apparently, its statements of monthly cash flows do not reflect the sums the corporation received for the sale of these items. To some extent, then, merely looking at Freedlander's monthly cash flow is misleading.

they had done in the past. After NCNB refused to extend further credit to Freedlander in August and the last of its wrongful acts been committed, these three alternatives remained open to the plaintiffs. The plaintiffs voluntarily chose one of these alternatives. On August 10, Eric Freedlander wrote NCNB's Board of Directors stating: "[I]t is my wish to resolve this dispute amiably. Surely there is a compromise for both the Bank and Freedlander to work this out, and I implore you to bring Mr. Kemp back to the negotiating table so that a reasonable settlement can be made." (Eric Freedlander, Affidavit, Exhibit J). Between August 10 and October 2, no act, past or present, forced Freedlander to the settlement table. On October 2, 1987, the plaintiffs still could have chosen to carrying on with their business and preserve their claims for a later day against NCNB, file suit against NCNB immediately, or seek the protection afforded by Chapter 11 bankruptcy.

The statement of Eric Freedlander, who signed the release on behalf of the corporation, regarding the conditions under which he signed the Settlement Agreement implicitly recognizes that Freedlander had alternatives on the day of signing the Agreement. He states:

> I did not want to agree to this transaction [the Agreement] because it would not provide nearly enough cash to solve our financial problems, nor would it remedy in any way the damage NCNB had inflicted upon us. Indeed, it took a number of weeks before I finally gave in because, once again, I had no choice. But NCNB had worn us down, and ultimately put us in such a weak position that we had no fight left. Its threat to continue to withhold payment of consideration owed to us under the July 10 Agreement, funds we desperately needed, was enough to overcome my will, and once again I had no choice but to agree to the Bank's terms. In addition, I feared that if we did not agree, the Bank would find a way to call our outstanding indebtedness, forcing us into bankruptcy. Our only choice was to agree to NCNB's terms, get whatever consideration we could, and hope that somehow, we could use that cash to keep our business afloat and to start us on the road to recovery.

Eric Freedlander Affidavit ¶ 67. Eric Freedlander considered two alternatives—seeking bankruptcy or giving into NCNB in the hope that Freedlander would ultimately survive—and, he made a business decision. Although Eric Freedlander felt the settlement would not provide enough cash, it would provide immediate cash. He apparently determined this was the best business alternative to pursue. In Virginia, "a contract reluctantly entered into by one badly in need of money without force or intimidation and with full knowledge of the fact is not a contract executed under duress." *Cary v. Harris*, 120 Va. 252, 91 S.E. 166 (1917).

Although there are no Virginia cases directly addressing the issue of alternative remedies, "[c]ourts have consistently held that the presence of an adequate legal remedy undermines claims of economic duress." *Ismert and Associates, Inc. v. New England Mutual Life Ins. Co.*, 801 F.2d 536 (1st Cir.1986). *See also Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Service Company*, 584 P.2d 15, 22 (1978) ("[I]n order to avoid a contract, a party must also show that he had no reasonable alternative to agreeing to the other party's terms, or, as it is often stated, that he had no adequate remedy if the threat were to be carried out ... An available legal remedy, such as an action for breach of contract, may provide such an alternative." [citations omitted]); 13 Williston on Contracts § 1617; Restatement (Second) of Contracts § 175.

This rule was applied in *Oskey Gasoline & Oil Co., Inc. v. Continental Oil Co.*, 534 F.2d 1281 (8th Cir.1976) a case with circumstances closely analogous to those here. In *Oskey*, an oil supplier breached its contract with one of its customers. As a result of the breach, the customer's oil business deteriorated. Desperate to secure some oil and with the hope that a resumption of relations with the supplier would lead to more oil than stipulated, the customer released its breach of contract claim

against the supplier in return for a reduced supply of oil. On a motion for summary judgment to void the release on grounds of economic duress, the Eighth Circuit held:

> [T]he evidence fails to show any oppressive conduct by [the supplier] inducing Oskey to execute the mutual release. The economic necessities experienced by Oskey can be attributed to [the supplier's] initial breach of contract, but that action gave rise to the alternative of a breach of contract suit which Oskey rejected in favor of a new supply contract with [the supplier].

*Id.* at 1288. Freedlander in effect made this same choice. In August it could have sued NCNB as it had threatened to do or it could have negotiated a release.

Similarly, filing a petition in bankruptcy has been held to be a legal option defeating a claim of economic duress. *Federal Deposit Insurance Corp. v. Linn*, 671 F.Supp. 547, 560 (N.D.Ill.1987) (in which the court assessed a claim of economic duress under Illinois law, law that imposes standards similar to Virginia's duress requirements). The court's rationale rings true here:

> Threatened bankruptcy is insufficient to create economic duress. [citation omitted] Quite the contrary is true on defendants' own version of things: Bankruptcy proceedings would appear to have been their opportunity for legal escape from oppressive demands by [the banks]. Any resulting financial embarrassment from declaring bankruptcy is not sufficient to explain why such legal redress would be inadequate. [citations omitted].

*Id.* at 560. Therefore, the option of filing for bankruptcy undermines the plaintiffs' contention that they were forced to sign the release.

The plaintiffs assert that filing for bankruptcy or filing a civil lawsuit were not viable options because the delay involved in pursuing one of them would have caused immediate and irreparable harm to Freedlander. The cases relied on by the plaintiffs involve one party deliberately withholding unique, essential goods or services at a critical time, thereby leaving the purchaser, who had contractual commitments to fulfill, with no choice but to accede to demands for premium prices. These cases are distinguishable upon the facts alleged by the plaintiffs and upon the legal philosophy that underlies these other state court decisions.

For example, in *Rose v. Vulcan Materials Company*, 282 N.C. 643, 194 S.E.2d 521 (1973), the seller raised the price of stone which he was to supply under a pre-existing contract. The buyer purchased the stone at the higher price and then immediately sued to recover the amount of overcharge. The court found that the evidence supported the plaintiff's contention that his only alternatives were to purchase the stones at the higher price from the defendant or to go out of business. *Id.* at 666, 194 S.E.2d at 536. Similarly in *Totem Marine Tug & Barge v. Alyeska Pipeline Service Co.*, 584 P.2d 15, 24 (Alaska 1978), the court found that Alyeska deliberately withheld payment of an acknowledged debt with the full knowledge that Totem was unable to meet its other pressing bills and was on the verge of bankruptcy. Freedlander has not presented evidence that it signed its release under similar exigent circumstances. In October, the fear of bankruptcy was no more pressing than it had been for the prior four months. The plaintiffs agreed to the settlement not with the view that it was the only means to avoid bankruptcy, but with the idea that it represented the *best* alternative to revive the ailing business. Eric Freedlander states: "[W]e were trying to get funds to pay our debts quickly in an effort to keep our business afloat. Despite the destruction worked by NCNB, we still had open offices and employees; we hoped, in some way, to salvage our operations. A lawsuit ... and a bankruptcy proceeding are long, drawn out procedures. We did not have the luxury of time to try to get our business going ..." (Eric Freedlander, Aff. ¶ 79)

Again, a comparison with the events of July 10 illustrates the difference between a situation where duress is properly a jury question and a situation where it is not.

On July 10 before he agreed to the sale of the servicing operations, Eric Freedlander was given no opportunity to reflect, no chance to discuss the matter with counsel, and no time to pursue other available legal remedies that would prevent immediate economic harm. Conversely, before signing the October 2 agreement, the plaintiffs had time to reflect, enjoyed the advice of counsel, and had explored other legal alternatives.

Moreover, even if the plaintiffs had established sufficient proof of exigent circumstances to make economic duress a jury issue under the Alaska Supreme Court's standard, Virginia has taken a different jurisprudential approach. In *Totem Marine*, the Alaska Supreme Court identified the conflicting policy concerns underlying a claim of economic duress:

> On the one hand, courts are reluctant to set aside agreements because of the notion of freedom of contract and because of the desirability of having private dispute resolutions be final. On the other hand, there is an increasing recognition of the law's role in correcting inequitable or unequal exchanges between parties of disproportionate bargaining power and a greater willingness to not enforce agreements which were entered into under coercive circumstances.

584 P.2d at 21. The Alaska Supreme Court struck the balance in favor of taking an active role in policing contracts and correcting inequalities: "If we find [the parties] positions are such that one party has unscrupulously taken advantage of the economic necessities of the other, then in the interest of justice—as a matter of public policy—we would refuse to enforce the transaction." *Inman v. Clyde Hall Drilling Company*, 369 P.2d 498, 500 (Alaska 1962), *quoted in Totem Marine*, 584 P.2d at 23, n. 4.

The Virginia Supreme Court has struck a different balance. It is reluctant to upset the terms of contracts entered into by two competent parties:

> [T]he law looks with favor upon the making of contracts between competent parties upon valid consideration and for lawful purposes, and "courts are averse to holding contracts unenforceable on the ground of public policy unless their illegality is clear and certain."

*Ryan v. Griffith*, 199 Va. 891, 895, 103 S.E.2d 240, 244 (1958), *quoting Wallihan v. Hughes*, 196 Va. 117, 125, 82 S.E.2d 553, 558 (1954). The court is equally reluctant to set aside contracts on the grounds of fraud or duress. *Jesse v. Smith*, 222 Va. 15, 278 S.E.2d 793 (1981). This is especially true in the case of a settlement agreement, a favored document under Virginia law. *Cary v. Harris*, 120 Va. at 257, 91 S.E. at 167 ("Compromise agreements are favored.").[5]

NCNB also contends that the plaintiffs' free will was not destroyed because throughout the final settlement negotiations they had the advice of attorneys from the firm of Christian, Barton, Epps and Chappell. Freedlander argues that the presence of attorneys is irrelevant. The deed was done. NCNB had backed Freedlander into a corner, and settlement provided the only means to obtain the cash that Freedlander needed. No amount of bargaining by attorneys could change the character of NCNB's coercive offer, argue the plaintiffs.

The presence of attorneys will not defeat a claim of economic duress *per se*, but a court must determine if the attorneys had an opportunity for meaningful input under the circumstances. *See Federal Deposit Insurance Corp. v. Linn*, 671 F.Supp. 547, 560 (N.D.Ill.1987); *Totem Marine Barge & Tug, Inc. v. Alyeska Pipeline Service Co.*, 584 P.2d 15, 24 (Alaska 1978). At issue are the plaintiffs' states of mind. Although Freedlander's attorneys may not have won the concessions that Freedlander sought

---

**5.** Indeed, it doesn't appear that in the field of contracts the doctrine of unconscionability has progressed in Virginia beyond the protection of widows and weak-minded from those who would prey upon them. *Compare Jackson v. Seymour*, 193 Va. 735, 71 S.E.2d 181 (1952) (rescinding a widow's deed of her property for one-tenth its value) *with Carter v. Carter*, 223 Va. 505, 291 S.E.2d 218 (1982) (despite a close family relationship and the opportunity for undue influence, the deed was upheld because the parties were dealing at arms' length).

and may have met with little success in changing the terms of NCNB's settlement offer, the attorneys' presence affected the plaintiffs' degree of voluntariness in accepting the settlement offer. The presence of attorneys during five weeks of negotiations (James Hance, Affidavit ¶¶ 5–7; Thomas Bower, Affidavit ¶¶ 6–7) suggests that the plaintiffs were fully informed of their alternatives to settlement. Their presence also suggests that once the decision was made to go forward with the settlement, the attorneys informed the Freedlanders of their rights under the agreement. Hence, although the attorneys could not change the terms of the Settlement Agreement, the evidence suggests that they did act as a calming influence and allowed the plaintiffs to rationally assess different alternatives. *See also Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 911–912 (3rd Cir.1985), *cert. denied*, 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986) (which sets forth the principle that the opportunity to consult with counsel vitiates a duress defense, cites additional authority for this proposition, and distinguishes cases such as *Litten v. Jonathan Logan, Inc.*, 200 Pa.Super. 274, 286 A.2d 913 (1977) where the presence of lawyers was of no assistance to the plaintiffs under the circumstances).

A third indicator of whether an agreement was voluntarily entered into is whether the complaining parties continue to accept and enjoy the benefits of its bargain once the duress has passed. NCNB notes that the plaintiffs accepted money under the terms of the agreement, signed a certificate of performance on October 9, and did not object to the Agreement until 4 months later. NCNB argues that the plaintiffs' behavior belies their claim of duress and in effect ratifies the Agreement. Freedlander asserts that the consideration they received under the terms of the Agreement was money that NCNB already owed. It only kept what it felt was due absent the Agreement. The plaintiffs claim the certificate too was signed under duress, and their decision to pursue this action 4 months after the signing of the agreement is of no consequence.

The decision not to complain about the agreement does reflect on the merits of their duress claim, however. A release signed under duress is voidable, not void. If the consideration passing at the time of the release is not returned, or the terms of the release are not challenged once the duress has passed, the release is ratified. Restatement (Second) of Contracts § 380 (1981). *See also Gloth v. Gloth*, 154 Va. 511, 552, 153 S.E. 879, 892 (1930) ("[I]t was incumbent upon the appellant to have proceeded promptly upon the removal of the duress, if such existed, to repudiate the contract.") *Accord Link Associates v. Jefferson Standard*, 223 Va. 479, 484, 291 S.E.2d 212, 215 (1982) ("A party intending to repudiate a contract on the ground of fraud must act within a reasonable time and with great punctuality upon learning of the wrong.") Although the plaintiffs' behavior does not rise to the level of ratification, their behavior does further discredit their claim that their free will was broken at the time they entered into the Settlement Agreement.

To prevail on their claim of economic duress, the plaintiffs must prove by clear and convincing evidence that NCNB committed wrongful acts and that those acts worked to subvert the plaintiffs' free will at the time they entered into the Settlement Agreement. For the purposes of this motion the Court has assumed that NCNB did commit wrongful acts. The Court further assumed that the plaintiffs would prove at trial all that they allege in their Amended Complaint. Yet, the plaintiffs have failed to present sufficient evidence, given their burden of producing clear and convincing proof, that would allow the matter of duress to go to a jury. They have failed to demonstrate the effects of NCNB's wrongful acts forced them to sign the Settlement Agreement. Other than the plaintiffs' own self-serving statements, no other evidence suggests that the plaintiffs involuntarily consented to the October 2 agreement and the general release contained therein. The plaintiffs had other alternatives available to it, benefited from the advice of counsel, and enjoyed the benefits of the settlement once the duress had

passed. These facts belie Eric Freedlander's claim that on October 2 the corporation's will was so broken that it involuntary submitted to NCNB's desires. More realistically, it appears that the plaintiffs made a business decision to settle their differences with NCNB and attempted to rebuild their business in that manner. That attempt having failed, the plaintiffs now wish to explore the alternatives they rejected on October 2.

■ The plaintiffs challenge the release on a second ground. They allege that NCNB breached the October 2 Agreement by transferring properties worth less than the values attached to them under the terms of the Agreement. As a consequence of the breach, the plaintiffs assert that they are relieved of performing under the contract, and hence they are no longer bound by the release contained in the Agreement. The plaintiffs also allege that NCNB was unjustly enriched by taking deductions that it was not entitled to. Since there are no material issues of fact in dispute, this matter is ripe for summary judgment.

Pursuant to paragraph 2 of the Settlement Agreement, NCNB was to convey certain loans (detailed in Exhibits D–1, D–2, D–3 of the Agreement) and property (detailed in Exhibit C of the Agreement) to Freedlander subject to deductions of $1,561,882 and $511,054 (Exhibit C1 of the Agreement). NCNB conveyed exactly the loans and property they said they would. The plaintiffs do not allege fraud—*i.e.* that the bank listed one set of properties and actually conveyed another or that NCNB intentionally overstated their value. (Ben Freedlander, decl. ¶¶ 24–30) They simply assert that because the loans and property turned out to be worth less than NCNB thought, NCNB breached the contract. " 'The guiding light in the construction of [a] contract is the intention of the parties as expressed by them in the words that they have used, and courts are bound to say that the parties intended what the written instrument plainly declares.' " *Meade v. Wallen,* 226 Va. 465, 467, 311 S.E.2d 103, 104 (1984), *quoting Magann Corp. v. Elec-*

*trical Works,* 203 Va. 259, 264, 123 S.E.2d 377, 381 (1962). Here, the contract speaks in a clear voice. These provisions were designed to modify the payments Freedlander claimed were owing under the July 10 Agreement. There is no ambiguity in the meaning of the terms, and NCNB has done exactly what it promised to do. The plaintiffs complaint is that they struck a bad bargain. There is no breach, and NCNB is entitled to summary judgment on Count XV of the Amended Complaint.

■ The plaintiffs' unjust enrichment claim, Count XVI, suffers from the same deficiency. Freedlander claims that NCNB was unjustly enriched by taking deductions of $1,561,882 and $511,054 because it had no right to those deductions. Whether or not NCNB was correct in taking the deductions is immaterial at this point. The plaintiffs agreed to these deductions under the terms of the October 2 Agreement. There is no evidence to suggest that NCNB mislead Freedlander as to the nature of these deductions. Consequently, the plaintiffs are estopped from arguing that NCNB is not entitled to payment. *See Hobbs v. Virginia National Bank of Petersburg,* 147 Va. 802, 836, 133 S.E. 595, 598 (1926) ("It is, however, a fundamental principle of law that a person cannot deny the effect of a writing intentionally and purposely signed by him in order to accomplish a definite object.")

Even if there was a breach, this would not free the plaintiffs from the terms of the release. The plaintiffs must demonstrate that NCNB's breach was a "material" breach. "Ordinarily, rescission will not be granted for breach of a contract which is not of such substantial character as to defeat the object of the parties in making the contract ..." *Bolling v. King Coal Theatres,* 185 Va. 991, 996, 41 S.E.2d 59, 62 (1947). Money damages would restore the bargained for objective of the contract, and would be the proper remedy if the Settlement Agreement was breached.

Freedlander bargained for the loans and property it received. NCNB is entitled to summary judgment on Counts XV and XVI of the Amended Complaint.

Let the Clerk send a copy of this memorandum opinion to all counsel of record.