Sally M. PARKERSON, Plaintiff,

v.

**FEDERAL HOME LIFE INSURANCE COMPANY, Defendant.**

No. 4:91CV00180.

United States District Court,
E.D. Virginia,
Newport News Division.

July 24, 1992.

Willard Montellous Robinson, Hall, Fox, Atler & Robinson, P.C., Newport News, Va., for plaintiff.

Robert Barnes Delano, Jr., Albert Marcellus Orgain, IV., Sands, Anderson, Marks & Miller, Richmond, Va., for defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

Sally M. Parkerson ("Mrs. Parkerson") instituted this action by filing in the Circuit Court for the City of Newport News, Virginia a motion for judgment alleging that Federal Home Life Insurance Company ("Federal Home") breached the terms of a life insurance policy it issued in the amount of $100,000 on the life of William W. Parkerson ("Mr. Parkerson"). The breach is alleged to have occurred when, following Mr. Parkerson's death on May 12, 1990, Federal Home denied Mrs. Parkerson's claim for the insurance proceeds; notified her that the policy was being rescinded because Mr. Parkerson had made material misrepresentations of fact respecting his health and medical condition when applying for the policy; and refunded the premiums with interest. The action was timely removed to this Court where both parties, having concluded discovery, have moved for summary judgment.

### STATEMENT OF THE RELEVANT RECORD

In early 1988, Mr. and Mrs. Parkerson purchased a new home. According to Mrs. Parkerson, the mortgage lender advised the Parkersons to obtain life insurance, apparently as a less expensive substitute for mortgage insurance. Mr. Parkerson contacted Curtis J. Hawks ("Hawks") who was then an employee of an independent insurance agency that sold life insurance policies issued by several insurers, including Federal Home. (Hawks Aff. ¶ 2). On May 10, 1988, Mr. Parkerson underwent a physical examination by Dr. D. Christopher Bosworth because:

[i]t was time ... [and] [p]lus, we were applying for insurance and he wanted to make sure everything was okay. So it would be to our best advantage that everything—to show that everything was okay and because it was time for it.

(Mrs. Parkerson Dep. at p. 13). On the same day, Mr. Parkerson kept an appointment he previously had arranged with Hawks to apply for life insurance in the amount of $100,000 (Hawks Aff. ¶ 3).

During the meeting between Hawks and Mr. Parkerson, Hawks read to Mr. Parkerson the questions posed on a standard Federal Home application form and recorded Mr. Parkerson's answers. At the conclusion of that process, Mr. Parkerson reviewed the answers Hawks had recorded and signed the application certifying that:

"[t]he above statements are true to the best of my knowledge and belief." [1] Mr. Parkerson's signature also acknowledged that he understood:

> that any misrepresentation contained herein relied on by the Company may be used to reduce or deny a claim or void the contract within the contestable period of such misrepresentation materially affects the acceptance of the risk.

The application form signed by Mr. Parkerson on May 10 also contained the following language:

> It is agreed that: (1) this application and all amendments to it and all answers made to the medical examiner shall be the basis for any insurance; (2) no agent or medical examiner can waive the answer to a question in this application, pass on insurability, waive our rights or requirements or make or alter a contract; ... 3(B) When Attached Receipt Is Given—if the first full premium is paid in advance to our authorized agent and the attached receipt is delivered to the owner then our liability shall be as stated in receipt....

(Application Form at p. 2). On May 10, Mr. Parkerson paid the first premium in advance ($179.40) and Hawks gave him a receipt which, as will be addressed in detail below, provided that the policy would become effective on the date when all required medical examinations were completed. [2]

The application contained several questions designed to secure from potential insureds information about their health and physical condition. (Application Form, Part II, Questions 12–17). Hawks did not secure this information from Mr. Parkerson on May 10 because it was to be provided by Mr. Parkerson during a paramedical examination to be conducted by a registered nurse on May 24.

Ms. Shirley Powell, a registered nurse, examined Mr. Parkerson at his home on May 24. Powell read to Mr. Parkerson the questions on a Medical Examiner's Report and recorded his answers. Mr. Parkerson then read the completed form and signed it declaring that "... the statements and answers shown above are true and complete to the best of my knowledge and belief, and I agree that they shall be basis of any insurance issued." (Powell Aff. ¶¶ 6–9; Defendant's Ex. 5). Mr. Parkerson gave the following responses to the following questions which are the focus of Federal Home's summary judgment motion:

> **Question 2:** Have you ever been treated for or ever had any known indication of (Circle applicable items and give details):
>
> e. Jaundice, intestinal bleeding, ulcer, hernia, hepatitis, colitis, diverticulitis, hemorrhoids, recurrent indigestion, or other disorder of the stomach, intestines, liver or gallbladder?

**Answer:** No.

> **Question 6: Other than above,** have you in the past year?
>
> d. Had any electrocardiogram, x-ray or other diagnostic test?

**Answer:** No.

> e. Been advised to have any diagnostic test, hospitalization or surgery which was not completed?

**Answer:** No.

For purposes of the pending motions, Mr. Parkerson's responses to these questions must be assessed in perspective of the record as it relates to what the objective facts show, and Mr. Parkerson knew on May 24, about the matters inquired of by Questions 2e, 6d and 6e.

Sometime near the end of 1987, Mr. Parkerson noticed blood in his stool (Mrs. Parkerson Dep. at p. 22). During the physical examination on May 10, Dr. Bosworth performed a Hemoccult test which showed a relatively high level of blood in Mr. Parkerson's stool. Dr. Bosworth's notes of that examination twice describe this as surpris-

---

**1.** (Hawks Aff. ¶¶ 5–9; Application Form, Defendant's Ex. 3 at p. 2 (hereinafter Application Form). The exhibits of Federal Home referred to in this opinion are attached to Defendant's Brief in Support of Summary Judgment, May 1, 1992.

**2.** Receipt, Defendant's Ex. 23 (hereinafter Receipt).

ing (Dr. Bosworth's Notes, May 10, 1988, Defendant's Ex. 1) (hereinafter Dr. Bosworth Notes). Dr. Bosworth gave Mr. Parkerson three Hemoccult tests and instructed Mr. Parkerson to administer them at home. *Id.*

According to Dr. Bosworth's notes and deposition testimony, he told Mr. Parkerson to return on June 13 for a proctoscopic examination. (*Id.;* Dr. Bosworth Dep. at p. 18). Dr. Bosworth's notes reflect: "If both of the above [home Hemoccult tests and proctoscopic examination] are negative, may do nothing more than follow Hemoccult periodically." (Dr. Bosworth Notes). Mrs. Parkerson testified at deposition that she and Mr. Parkerson understood Dr. Bosworth to have said that the proctoscopic examination might not be necessary, depending upon the results of the three Hemoccult tests to be administered by Mr. Parkerson at home. (Mrs. Parkerson Dep. at pp. 20–21).

By affidavit Mrs. Parkerson testified that: "[w]e attached no significance to the request [to conduct the home Hemoccult tests] and both of us believed that this was a routine matter with no significance." (Mrs. Parkerson Aff. ¶ 1). In this regard, Dr. Bosworth testified at deposition that:

> I told him [Mr. Parkerson] that it was a positive test. Many of these cases are false-positive. There is [sic] many different reasons they can be false-positive, and I just told him we needed to confirm it.

(Dr. Bosworth Dep. at p. 15). Although Dr. Bosworth told Mr. Parkerson "why we were giving him the other tests," Dr. Bosworth likely did not do so forcefully because it was his usual practice not to alarm patients until there was "hard data" available. (Dr. Bosworth Dep. at p. 22).[3]

On May 11, Mr. Parkerson again noticed blood in his stool. Mrs. Parkerson says that she told her husband that this might have been caused by the examination on the preceding day (Mrs. Parkerson Dep. at pp. 22–23).

Mr. Parkerson administered the three home Hemoccult tests shortly before June 13 when he returned them to Dr. Bosworth and the proctoscopic examination was conducted. Those tests, and others which followed, confirmed the presence of colon cancer which necessitated surgical excision of part of the colon on July 29, 1988.

In approximately mid-August 1988, Hawks delivered the Federal Home policy to Mr. Parkerson who was then at his office (Hawks Dep. at p. 29). According to Hawks, the following exchange occurred just as Hawks was leaving Mr. Parkerson's office:

> As I was getting ready to leave, I was up out of my seat about halfway across the room between his desk and the door, he made a comment to the fact that he had just realized he had been diagnosed with cancer of the colon, and I only said it is great that you got this policy because my mother had it and that is why—she got over it. She had some surgery, was on a special diet. I suggested he might look at the same situation, have surgery, consider a diet.
>
> I said, definitely you want to keep that policy, and that was it.

(*Id.* at p. 30). Hawks did not report this conversation to Federal Home. (*Id.* at p. 41).

In May 1989, it was discovered that Mr. Parkerson had lung cancer. He died on May 12, 1990.[4] Mr. Parkerson continued to pay premiums until he died.

When Federal Home was investigating Mrs. Parkerson's claim to the insurance

---

**3.** The record does not disclose the sequence of the events on May 10, 1988. Counsel for both sides recite efforts to determine which event (the examination by Dr. Bosworth or the meeting with Hawks to apply for insurance) occurred first. However, both sides say that, at least for now, the sequence of these events remains unknown.

**4.** Although it is not relevant to the decision on the issues now before the Court, the certificate of death states that the immediate cause of Mr. Parkerson's death was colon cancer and describes the underlying cause as lung cancer. (Death Certificate, § 28, Part I, Defendant's Ex. 24). Dr. Bosworth has expressed the view that the cause of death was lung cancer. (Dr. Bosworth Aff.).

proceeds, it learned of the May 10 Hemoccult test results, of the prescription of the three home Hemoccult tests by Dr. Bosworth, and of the proctoscopic examination scheduled on May 10 to take place on June 13. Subsequently, Federal Home advised Mrs. Parkerson that, if this information had been made known at the May 24 medical examination or otherwise in the application, issuance of the policy would have been postponed pending a full work-up on Mr. Parkerson's state of health and asserted that Mr. Parkerson's omission of the information known as of May 24 was an "... apparent misrepresentation which materially increases the risk and hazard assumed by the Company." The premiums plus interest ($1,725.68) were returned to Mrs. Parkerson along with a letter dated March 18, 1991 which advised of Federal Home's decision to rescind the policy.

## THE STANDARD FOR SUMMARY JUDGMENT

Rule 56(c), Fed.R.Civ.Pro., provides that summary judgment is to be rendered "... if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Under subsection (e) of Rule 56:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

 It is the responsibility of the party seeking summary judgment to inform the court of the basis for its motion, and to identify the parts of the record and affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S.

317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Pocahontas Supreme Coal Co. v. Bethlehem Steel,* 828 F.2d 211, 216 (4th Cir.1987). Where the non-moving party bears "... the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on 'the pleadings, depositions, answers to interrogatories and admissions' on file." *Celotex Corp. v. Catrett, supra* 477 U.S. at 324, 106 S.Ct. at 2553. The moving party may also use affidavits to support its motion. In either event, the non-moving party must go beyond the pleadings and, by citing its own affidavits or by citing " 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* Opposition to a properly documented summary judgment motion may not be based solely on the pleadings.

The "... mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). It is the function of the district court, not to weigh the evidence, but to determine whether there is a genuine issue for trial and "... there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2511 (citations omitted). Hence, summary judgment is appropriate if the "evidence is merely colorable" or "is not significantly probative." *Id.* at 249–50, 106 S.Ct. at 2511 (citations omitted). The standard for summary judgment mirrors the standard for directed verdict (now judgment as a matter of law) under Rule 50(a), Fed.R.Civ.Pro., the principal difference being procedural. *Id.* at 251, 106 S.Ct. at 2511–12. And, "[w]here the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S.

574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted). The non-moving party, however, "... need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact for trial." *Anderson v. Liberty Lobby, Inc., supra,* 477 U.S. at 257, 106 S.Ct. at 2514–15. The district court also "... must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254, 106 S.Ct. at 2513.

■ Furthermore, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513; *McKinney v. Board of Trustees of Maryland Community College,* 955 F.2d 924, 928 (4th Cir.1992). Summary judgment is appropriate only if, upon consideration of the record as a whole, a reasonable trier of fact could not find for the non-movant. *Allstate Financial Corp. v. Financorp, Inc.,* 934 F.2d 55, 58 (4th Cir.1991). However, where a faithful examination of the record establishes the absence of a genuine issue of material fact, it is "... the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987); *See also, Guinness PLC v. Ward,* 955 F.2d 875, 883 (4th Cir. 1992). With these principles in mind, the Court will consider the motions for summary judgment filed by Mrs. Parkerson and Federal Home.

### THE INCONTESTABILITY ISSUE

■ Mrs. Parkerson seeks summary judgment on the ground that the insurance policy was not contestable after May 10, 1990. The incontestability clause of the policy provides:

> We will not contest this policy after it has been in force during your lifetime for two years from the Date of Issue, except for failure to pay premiums.

(Policy, General Provisions, p. 9, Defendant's Ex. 6). This is consistent with the requirements of Virginia law which directs that:

> Each individual life insurance policy shall contain a provision that the policy shall be incontestable after it has been in force during the lifetime of the insured for two years from its date, except for non-payment of premiums.

(Va.Code Ann. § 38.2–3107(A) (1990)).[5]

The policy states that the Date of Issue was May 24, 1988 (Policy, p. 3, Defendant's Exhibit 6). This is consistent with provisions of the application form and the receipt which are part of the policy. J. Appleman, *Insurance Law and Practice,* § 7582 at 237 (1976); *Southern Mut. Ins. Co. v. Yates,* 69 Va. (28 Gratt.) 585 (1877). The application form provides that where, as here, the insured pays the first full payment in advance and is given the receipt which is attached to the application form, Federal Home's "liability shall be as stated in the receipt." (Application Form at p. 2, ¶ 8). The receipt provides that when:

> (1) negative answers are given to health questions numbers 12(a) and (b);
>
> (2) the first full premium is taken with the application form;
>
> (3) all required medical examinations have been timely completed; and
>
> (4) the proposed insured is a standard risk acceptable to the insurer,

the insurance is effective on the Effective Date. (Receipt). "Effective Date" is defined as the latest of:

> (a) the date of the application to which the receipt is attached, or
>
> (b) the date of completion of all medical examinations, texts, x-rays and electrocardiograms required by published Company rules, or
>
> (c) the Date of Issue, if any, requested in the application.

(*Id.*).

The application shows, and the parties agree, that subparagraph (c) is not applica-

**5.** Section 38.2–3305 of the Virginia Code contains identical language except that it uses the term "date of issue" instead of "date" to mark the commencement of the two year period during which this policy remains contestable. Va. Code Ann. § 38.2–3305 (1990). There appears to be no substantive difference.

ble. It is not disputed that the medical examination was completed on May 24, 1988 or that the application form is dated May 10, 1988. Hence, under the clear language of the receipt, which is part of the policy, the Effective Date is May 24, 1988.

Mrs. Parkerson asserts that the policy became incontestable on May 10, 1990, two years after the date on which Mr. Parkerson signed the application form and paid the first premium in advance. This argument is based on the following language which appears in the Policy Summary near the front of the policy:

> This is a one year term insurance policy. We will pay a death benefit if the insured dies while the policy is in force. "In force" means that the insurance has not been terminated.

(Policy, General Provisions, at p. 2, Defendant's Ex. 6).[6] However, this language does not set the date on which the two year contestability period begins to run. Instead, this language simply explains that once coverage begins the policy remains in force until it is terminated.

The starting point for the contestability period is defined by statute to be "from its date."[7] Although the policy uses the phrase "from the Date of Issue," there is no substantive difference between the statutory language establishing the starting point ("from its date") and the policy language ("from the Date of Issue"). Both phrases delineate a point when the insurance is effective and the insured is entitled to the benefits of the policy.[8] It is that point which marks the commencement of the contestability period.

Thus, the clear language of the statute and the clear language of the policy preclude use of the language urged by Mrs. Parkerson to define the starting point for the commencement of the contestability period. Mrs. Parkerson has provided no decisional support for the interpretation she

advances, and the Court has been unable to find any decision which would support it. For the foregoing reasons, the Court holds that the contestability period in Mr. Parkerson's policy began to run on May 24, 1988 and Mrs. Parkerson's motion for summary judgment on that issue will be denied.

## THE MATERIAL MISREPRESENTATION ISSUE

Federal Home has moved for summary judgment on the ground that Mr. Parkerson "... made material misrepresentations during the application process which rendered void ab initio the insurance policy that was issued on [Mr.] Parkerson's life." (Federal Home's Motion for Summary Judgment at p. 1). Under Virginia law:

> [N]o statement in an application or in any affidavit made before or after loss under the policy shall bar a recovery upon a policy of insurance *unless it is clearly proved that such answer or statement was material to the risk when assumed and was untrue.*

Va.Code Ann. § 38.2–309 (1990) (emphasis added).

### 1. *The Materiality Question.*

■ The materiality of a misrepresentation, if shown to have been made, is an issue of law to be decided by the courts. *Old Republic Life Ins. Co. v. Bales*, 213 Va. 771, 773, 195 S.E.2d 854, 856 (1973). There is no dispute that Mr. Parkerson made the representations which Federal Home alleges to have been untrue. Nor is there a dispute about the substance of the answers Mr. Parkerson gave to Questions 2e, 6d and 6e on the Medical Examiner's Report. Mrs. Parkerson's counsel stipulated at oral argument on the motions for summary judgment that, if the representations Mr. Parkerson made were untrue, they would be material within the meaning

---

6. The immediately preceding paragraph describes this language as a summary and states that the actual policy provisions, not the summary, control the rights of the parties.

7. Va.Code Ann. § 38.2–3107 (1990).

8. This conclusion is confirmed by the fact that the Virginia statute governing group life insurance policies uses the language "from the date of issue" as the starting point for the two year incontestability clause requirement in that section of Virginia's insurance regulatory statutes. Va.Code Ann. § 38.2–3305 (1990).

of the statute. Accordingly, the parties agree that the question of materiality is to be resolved in favor of Federal Home.

The record also clearly establishes that the alleged misrepresentations respecting Mr. Parkerson's health were material to the risk assumed by Federal Home. The affidavit of John H. Bryant, Vice–President and Chief Underwriter for Federal Home clearly satisfies the insurer's burden on this issue. Mrs. Parkerson offered no evidence to rebut the showing made by Federal Home on that point and, under familiar principles governing the application of Rule 56, Fed.R.Civ.Pro., Federal Home is entitled to summary judgment in its favor on the question of materiality wholly apart from the stipulation made at oral argument.

### 2. The Truthfulness Question.

■ An insurer is entitled to receive truthful and full representations from prospective insureds. *Mutual of Omaha Ins. Co. v. Echols*, 207 Va. 949, 154 S.E.2d 169, 172 (1967); *Chitwood v. Prudential Ins. Co.*, 206 Va. 314, 143 S.E.2d 915, 918 (1965). This is because a true and full disclosure places the insurer on notice to make its own inquiries to determine whether to assume the risk it is asked to insure. *Id.*

■ It is usually not necessary, under the Virginia statute, for an insurer to establish that an untrue representation was willfully false or fraudulently made. *Insurance Co. of North America v. United States Gypsum Co.*, 639 F.Supp. 1246 (W.D.Va.1986); *Chitwood, supra*, at 918. However, where, as here, the insurer asks the insured to aver only that the representations are true to the best of the insured's knowledge and belief, the insurer must clearly prove that the insured's answers were knowingly false. *Old Republic Life Ins. Co. v. Bales*, 213 Va. 771, 773, 195 S.E.2d 854, 856 (1973); *Sterling Ins. Co. v. Dansey*, 195 Va. 933, 942, 81 S.E.2d 446, 452 (1954).

■ It is generally the rule that whether a statement is true or not and whether an untrue statement was knowingly made are questions of fact reserved for determination by the jury. *United States Fidelity & Guar. Co. v. Haywood*, 211 Va. 394, 396, 177 S.E.2d 530, 532 (1970). However, where the record shows clearly that the insured gave statements that were not true and correct to the best of the insured's knowledge and belief, the Supreme Court of Virginia has held that a trial court errs in submitting that question to the jury. *Echols, supra*, 154 S.E.2d at 172.[9]

Under federal procedure, summary judgment is generally inappropriate when motive, intent or state of mind is material. 6 (part 2) James W. Moore et al., *Moore's Federal Practice* ¶ 41.1 at pp. 56–526 (2d ed. 1988). This is because ordinarily a determination of state of mind involves drawing factual inferences as to which reasonable people might differ and often requires the assessment of credibility and these, of course, are matters reserved for determination by the jury. 10A Charles A. Wright, Arthur R. Miller, and Mary Kay Kane, *Federal Practice and Procedure*, § 2730 at 238 (2d ed. 1983); *Magill v. Gulf & Western Indus., Inc.*, 736 F.2d 976, 979 (4th Cir.1984). "However, summary judgment may be properly granted as to such issues when the movant has clearly demonstrated that no triable issue of fact exists and it is entitled to summary judgment as a matter of law." James W. Moore et al., *Moore's Federal Practice* ¶ 41.1 at pp. 56–530 to 56–531 (2d ed. 1988); *Freedlander, Inc. v. NCNB National Bank of North Carolina*, 706 F.Supp. 1211, 1212 (E.D.Va. 1988), *aff'd*, 921 F.2d 272 (1991) (per curiam).

■ Accordingly, it is the duty of the courts to determine, from the record the parties have presented for decision and according to the current rules governing the respective duties of the moving and the non-moving parties, whether summary judgment is appropriate. In so doing, dis-

---

**9.** In *Echols,* the insured's motion for judgment admitted facts that showed the representations she made in the insurance application to have been untrue. Federal Home contends here that the objective record shows that Mr. Parkerson's statements on May 24 were knowingly untrue.

trict courts must exercise great care to view the facts of record in the light most favorable to the non-moving party and to accord the non-moving party the benefit of all justifiable inferences. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *Overstreet v. Kentucky Central Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir.1991).[10]

Federal Home bases the defense of its decision to rescind the policy and its motion for summary judgment on what it asserts to be knowingly false answers to three questions put to Mr. Parkerson by Powell during the May 24 medical examination. Question 2e asked Mr. Parkerson to tell Federal Home whether he had ever been treated for, or had an indication of, intestinal bleeding. Question 6d asked Mr. Parkerson to tell Federal Home whether in the past five years he had had any diagnostic tests not disclosed in responses to other questions. Question 6e asked Mr. Parkerson to tell Federal Home whether in the past five years he had been advised to have any diagnostic test which was not completed.[11] Mr. Parkerson answered "no" to each of these questions.

Federal Home asserts that, at the time those negative answers were given on May 24, Mr. Parkerson knew that:

1. He had observed the presence of blood in his stool sometime in late 1987;

2. The Hemoccult test and rectal examination conducted on May 10, 1988 revealed blood in his stool;

3. Dr. Bosworth had given him three additional Hemoccult tests to be self-administered at home and those tests had not yet been administered;

4. Dr. Bosworth had told Mr. Parkerson that there was the possibility of a proctoscopic examination on June 13;

5. Blood again had appeared in his stool on May 11.

The Court finds that there is no dispute that Mr. Parkerson knew what Federal Home claims that he knew on May 24.

Federal Home argues that on this record a reasonable jury would be required to decide that Mr. Parkerson knowingly and falsely answered questions 2e, 6d and 6e. Mrs. Parkerson argues that neither she nor Mr. Parkerson placed any importance or significance on the instructions received at the May 10 examination; and that a jury should be allowed to determine whether the words "indication of intestinal bleeding" in Question 2e and "diagnostic test" in Questions 6d and 6e should have elicited from Mr. Parkerson a disclosure of the observed blood in late 1987, of the positive Hemoccult test on May 10, of the observed blood on May 11, of what he had learned on May 10 from Dr. Bosworth, and of the instructions he had received to administer the three home Hemoccult tests and return on June 13 to Dr. Bosworth for a possible proctoscopic examination.

Question 2e asked Mr. Parkerson to disclose to Federal Home whether he had ever been treated for, or had any known indication of, *inter alia,* intestinal bleeding. It is not disputed that Mr. Parkerson knew that there was blood in his stool in late 1987. Mrs. Parkerson and Dr. Bosworth confirm that Dr. Bosworth told Mr. Parkerson on May 10 that he had blood in his stool and that the purpose of the three home Hemoccult tests was to confirm the results of the May 10 Hemoccult test. There is also no dispute that Mr. Parkerson noticed blood again on May 11. Dr. Bosworth testified that blood in the stool is indicative of intestinal bleeding. (Dr. Bosworth Dep. at p. 32).

Question 6d required Mr. Parkerson to disclose to Federal Home whether, within

---

**10.** Where the non-moving party has the burden of proof at trial, it is the rule in this circuit that, in state of mind cases, the non-moving party is entitled to have his or her version of disputed facts accepted as true, to have internal conflicts in the evidence resolved in her favor, to have the credibility of her evidence assumed and to be accorded the benefit of all favorable legal theories invoked by the evidence when so con-

sidered. *Overstreet,* 950 F.2d at 937. Here, of course, Federal Home is the moving party and at trial it has the burden to prove clearly the knowing falsity of the alleged misrepresentations.

**11.** *See* p. 1310, *supra,* and Defendant's Ex. 5 for complete text of all three questions.

the preceding five (5) years, he had any diagnostic tests that were not disclosed in answers to questions previously posed by Powell from the Medical Examiner's Report. Although Mr. Parkerson knew that the May 10 Hemoccult test was to determine the presence of blood in his stool and that it had resulted in a positive finding and that this finding necessitated the conduct of three additional tests, he told Powell on May 24 that he had had no diagnostic tests in the preceding five (5) years.

Question 6e asked Mr. Parkerson to disclose to Federal Home whether he had been told to undergo any diagnostic test which had not yet been completed. On May 24, Mr. Parkerson knew that he was still facing three home Hemoccult tests. The record shows that Dr. Bosworth told Mr. Parkerson why the other tests were required. Giving Mr. Parkerson the benefit of all inferences, he knew that there was at least the prospect of a proctoscopic examination on June 13, depending on the outcome of the three home Hemoccult tests which he himself was to administer.

Mrs. Parkerson does not directly dispute, or even try to refute, this proof. Instead, Mrs. Parkerson argues that the issue of knowing falsity should be submitted to the jury because a jury might conclude that: (1) Mr. Parkerson subjectively did not believe that the blood he knew was in his stool did not constitute an indication of bleeding from the intestine; and (2) that Mr. Parkerson subjectively did not believe that the word "diagnostic test" in Questions 6d and 6e included the May 10 Hemoccult test, the three Hemoccult tests to be self-administered by Mr. Parkerson at home or the prospect of a proctoscopic examination. That argument, in turn, is based on the assertion that it is for the jury to decide what a lay person would understand the language ("indication of intestinal bleeding" and "diagnostic tests") to

mean in the context of Questions 2e, 6d and 6e when considered in their entirety. (Mrs. Parkerson Brief, May 18, 1992, at pp. 3–4). The problem with the argument and the assertion on which it is based is that there is neither a legal predicate nor a factual basis in the record to give them support.

As the outset, it is appropriate to note that there is no affirmative evidence that Mr. Parkerson did not understand the words "indicative of intestinal bleeding" or "diagnostic test." Nor is there any evidence of the subjective belief Mr. Parkerson possessed as to the meaning of those words. This, however, is not determinative because, where state of mind is at issue, the non-moving party's subjective state of mind must be reasonable in light of the objective facts. *Freedlander*, 706 F.Supp. at 1212. Accordingly, the Court must consider the record of objective facts as it bears on the particular state of mind issue presented for decision.

It is not contended that Mr. Parkerson was illiterate, unintelligent or incapable of understanding either the English language or the process of obtaining insurance. To the contrary, the record shows that Mr. Parkerson was a self-employed businessman whose was attending to his personal affairs in an informed fashion when the events at issue occurred. He, rather than Hawks, first broached the subject of buying insurance from Federal Home. And, Mr. Parkerson was pursuing coverage simultaneously with another insurer.[12] In fact, Mr. Parkerson made an informed decision to have a physical examination because he thought that would facilitate the purchase of the life insurance he wanted. Hence, it would be unavailing for Mrs. Parkerson to argue that the process of obtaining insurance or the language at issue was beyond her husband's capacity to understand.[13]

---

12. Mr. Parkerson applied for another life insurance policy with another company on June 3, 1988. That company also refused to pay death benefits and the subsequent suit in the Newport News Division of this Court has been settled. *Parkerson v. New York Life Ins. Co.*, No. 91–17–NN (E.D.Va. filed Feb. 6, 1991).

13. The record reflects that Mrs. Parkerson said her husband did not understand medical terminology as well as she did and that for this reason she joined him to discuss the results of the May 10 examination with Dr. Bosworth. (Mrs. Parkerson Dep. at pp. 19–20). However, this motion does not turn on medical terminology.

Nor does Mrs. Parkerson contend that the language at issue constitutes medical or technical words beyond the ken of the average person. The usual meaning of "intestine" is "the tubular part of the alimentary canal that extends from the stomach to the anus" and "intestinal" is defined to mean "affecting or occurring in the intestine;" "living in the intestine;" and "of, relating to or being the intestine." (Webster's Ninth New Collegiate Dictionary (1990)). Mrs. Parkerson has offered no evidence that Mr. Parkerson actually thought that the language "indication of intestinal bleeding" excluded the bleeding he had experienced and observed and about which he had conversed with Dr. Bosworth on May 10. There is no evidence that the average person would give the words "indication of intestinal bleeding" any meaning which would exclude blood in the stool as intestinal bleeding. And, as noted above, Dr. Bosworth testified that the bleeding experienced by Mr. Parkerson was intestinal bleeding.

"Diagnose" means "to recognize (as a disease) by signs and symptoms;" "to analyze the cause or nature of" a problem. "Diagnostic" is defined as the art of practicing diagnosis. *Id.* Mrs. Parkerson has offered no evidence that Mr. Parkerson actually thought that the language "diagnostic test" excluded the May 10 Hemoccult test, the three home Hemoccult tests or the possible proctoscopic examination. The record shows that Mr. Parkerson was fully aware that the three home Hemoccult tests and the prospect of a proctoscopic examination were for the purpose of determining the existence and cause of the bleeding he had experienced and observed. And, Dr. Bosworth testified that he told Mr. Parkerson why the further testing was being done. There is no evidence that the average person would give the words "diagnostic test" any meaning which would exclude the May 10 Hemoccult test, the

three home Hemoccult tests or the potential proctoscopic examination.

To defeat summary judgment on the record made by Federal Home, it was incumbent on Mrs. Parkerson to identify some genuine dispute about the language at issue or about Mr. Parkerson's understanding of it, or about his ability to understand it. However, there is no evidence that Mr. Parkerson did not understand, or did not have the capacity to understand, the plain meaning of the language "indication of intestinal bleeding" and "diagnostic tests." Nor is there any showing that the average person would not understand the language at issue to have required disclosure of the information known to, but not disclosed by, Mr. Parkerson. Mrs. Parkerson elected to meet the showing made by Federal Home with an argument having no factual or evidentiary basis in the record. Even when Mrs. Parkerson is accorded the full measure of generosity properly required in state of mind cases, she cannot be said to have shown a genuine issue for trial.

The asserted impediment to summary judgment is the contention in Mrs. Parkerson's brief that the jury might conclude that somehow the language in the questions put to Mr. Parkerson did not call for disclosure of what he undeniably knew. It is now settled that the unsupported argument of counsel in pleadings cannot preclude the entry of summary judgment because they "fail to meet the evidentiary standard necessary to create a genuine issue of material fact." *Rountree v. Fairfax County School Bd.*, 933 F.2d 219, 223 (4th Cir.1991).[14]

As a related argument, Mrs. Parkerson says that the information given by Mr. Parkerson to Hawks when he delivered the policy in mid-August shows that Mr. Parkerson did not try to hide his condition and that this creates a jury issue as to whether Mr. Parkerson's answers on May 24 were knowingly false. That evidence, however,

---

**14.** *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Pachaly v. City of Lynchburg,* 897 F.2d 723, 725 (4th Cir.1990)

(The plaintiffs "may not rest upon mere allegation or denials of [their] pleading, but must set forth specific facts showing that there is a genuine issue for trial."); *Miller v. Federal Deposit Ins. Corp.,* 906 F.2d 972, 973–74 (4th Cir.1990).

is insufficient, alone or with other evidence, to create a jury issue where the undisputed record shows the statements were untrue and the record otherwise clearly shows that the insured knew the true state of matters when he gave answers to the questions on May 24.

Finally, Mrs. Parkerson argues that neither she nor Mr. Parkerson considered the knowledge Mr. Parkerson possessed to be significant. It does not matter that Mr. and Mrs. Parkerson thought that knowledge to be insignificant or unimportant. A decision not to disclose the truth for that reason would have been made at Mr. Parkerson's peril because under Virginia law an insurer is entitled to full and truthful disclosure. It is for the insurer to decide whether the true facts are significant or important because it is the insurer which is assuming the risk to which the true facts relate. If, as Mrs. Parkerson suggests, disclosure was withheld because the information was considered insignificant, the prospective insured did not satisfy the duty imposed by Virginia law.

For the foregoing reasons, the Court holds that Federal Home is entitled to summary judgment on the propriety of its decision to refuse payment of the proceeds of the insurance under the provisions of the Virginia statute. However, Federal Home also has moved for dismissal of the action with prejudice. For the reasons set forth below, that part of Federal Home's motion is denied.

## THE ESTOPPEL ISSUE

■ Mrs. Parkerson also has moved for summary judgment on the theory that Federal Home is estopped from relying on any misrepresentations of material fact because Federal Home continued to accept premium payments from Mr. Parkerson for twenty-one months after August 1988 when Federal Home's agent, Hawks, was told by Mr. Parkerson that he "had just realized he had been diagnosed" as having colon cancer. Mrs. Parkerson argues that the statement by Mr. Parkerson to Hawks should have placed Federal Home on notice to investigate the statements Mr. Parkerson made on May 10 and May 24, 1988 when he was applying for the policy.

Both parties agree that, under Virginia law, Federal Home is chargeable with such knowledge as Hawks possessed in August 1988. *Employers Commercial Union Ins. Co. v. Great American Ins. Co.*, 214 Va. 410, 200 S.E.2d 560 (1973). There is no dispute over what knowledge Hawks had then. Hawks testified that in mid-August 1988 he delivered the policy to Mr. Parkerson and that, as Hawks was leaving, Mr. Parkerson "... made a comment to the fact that he had just realized he had been diagnosed with colon cancer." (Hawks Dep. at pp. 29–30). Hawks replied that:

"[i]t is great that you got this policy because my mother had it and that is why—she got over it. She had some surgery, was on a special diet. I suggested he might look at the same situation, have surgery, consider a diet."

"I said, definitely you want to keep this policy, and that was it." (*Id.* at p. 30). Hawks never reported this conversation to Federal Home (*Id.* at p. 31).

In the context of litigation over insurance policies, the equitable doctrine of estoppel applies to preclude assertion by an insurer of its rights and privileges where it would be inequitable to permit the insurer to assert them. The general rule, which is followed in Virginia, is that:

[i]t [estoppel] necessarily implies prejudicial reliance of the insured upon some act, conduct, or non-action of the insurer. Such action or non-action need not be with knowledge on the part of the insurer of the circumstances giving it the particular rights and privileges in question. If the facts are such as to put the insurer on inquiry, the insurer, for purposes of invoking an estoppel, is conclusively presumed to have knowledge if a reasonably prudent person would pursue such inquiry and obtain such knowledge; or if the insured is legally justified in believing that the insurer has knowledge, and its act or conduct, though merely thoughtless or inadvertent, induce a belief in him that the company will not assert its rights, upon which belief he

relies and is detrimentally effected in some manner, as an estoppel will arise.

J. Appleman, *Insurance Law and Practice,* § 9081 at 496 (1968). The Supreme Court of Virginia has defined the equitable doctrine of estoppel as:

the consequence worked by operation of law which enjoins one whose action or inaction has induced reliance by another from benefiting from a change in his position at the expense of another.

*Employers Commercial Union Ins. Co.,* 214 Va. at 412, 200 S.E.2d at 562 (1973).

It cannot be said, as a matter of law, that what Hawks said Mr. Parkerson told him should have excited Federal Home to inquire further. The record contains no evidence addressed to whether the conversation between Hawks and Mr. Parkerson in mid-August should have put a reasonable insurer on notice to inquire further.

Further, Mrs. Parkerson has offered no evidence that Mr. Parkerson prejudicially relied on any act or inaction of Federal Home. Nor does the record identify any change of position on the part of Mr. Parkerson. Finally, even if is assumed that Mr. Parkerson was legally justified in believing that Federal Home had knowledge, Mrs. Parkerson has identified no conduct or act which induced in Mr. Parkerson a belief that the company would not assert its rights.

The absence of a record on these points precludes summary judgment on the basis of the estoppel Mrs. Parkerson asserts.[15] She is, however, entitled to have this issue tried by the jury.

Federal Home contends that Mr. Parkerson's actions constitutes unclean hands which precludes estoppel. (Federal Home's Rebuttal Brief, May 28, 1992, at p. 16). Federal Home argues that the equitable doctrine of estoppel cannot be invoked where "the alleged acts complained of were induced by his own or false representations." *Id.* (citing *Pennsylvania Casualty Co. v. Simopoulos,* 235 Va. 460, 369 S.E.2d 166 (1988)). This appears to miss the point because Mrs. Parkerson does not base her claim of estoppel on acts which Federal Home contends to be misrepresentations. Instead, Mrs. Parkerson says that Federal Home is estopped to rely on the original misrepresentations because it continued to accept premiums after Mr. Parkerson disclosed that he had been diagnosed with colon cancer and this knowledge was sufficient to require further inquiry by Federal Home. Those acts occurred almost three months after the original misrepresentations and for many months thereafter.[16]

Mrs. Parkerson has made an insufficient showing to permit the Court to decide the estoppel question in her favor on summary judgment. Federal Home correctly points out that the unclean hands doctrine is neither offered for, nor on this record is it subject to, resolution on summary judgment.

---

15. Mrs. Parkerson's briefs rely heavily on the fact that Federal Home accepted premiums for twenty-one months after Hawks had been told that Mr. Parkerson had received a diagnosis of colon cancer. At oral argument, Mrs. Parkerson's counsel referred to this as the "waiver." In Virginia, waiver is a doctrine at law, by which a party, knowing of his rights, voluntary surrenders them. Intent to surrender the known right is a key element of waiver. *Employers Commercial Union Ins. Co.,* 214 Va. at 412–13, 200 S.E.2d at 562. This case does not fit the Virginia rules on waiver. And, under Virginia law, waiver "... can never arise constructively or by implication." *Id.*

16. The Court currently considers, but has not decided, that the original misrepresentations made by Mr. Parkerson do not provide the basis for an unclean hands defense because the acts alleged to give rise to the estoppel occurred after those misrepresentations were made. If Federal Home's brief is intended to assert that Mr. Parkerson's statement to Hawks in mid-August was a misrepresentation which is the basis of the unclean hands defense, that issue is neither ripe for, nor is it likely resolvable on, summary judgment.